E-FILED
Friday, 09 February, 2018  02:13:48 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SHARON K. MILBURN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-cv-3264 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENTATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE

Plaintiff Sharon K. Milburn appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Milburn filed a Motion for Summary Judgment (d/e 13).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 17).  This matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be affirmed.

## STATEMENT OF FACTS

Milburn was born on April 21, 1960.  She completed high school. Milburn previously worked as a Federal Express service agent.  She

worked for Federal Express for over 20 years.  She last worked on October 5, 2012.  Milburn also served on active duty in the United States Army from February 6, 1980 to August 24, 1989.  In December 1987, Milburn suffered a traumatic brain injury (sometimes referred to as TBI) in an automobile accident while on active duty.  Milburn now suffers from impairments due to the late effects of that traumatic brain injury.  R. 67, 89, 117, 838, 846.

On March 18, 2011, Milburn filed an application for Disability Benefits. She alleged that she became disabled on March 16, 2011 (the Onset Date).  R. 89.  Milburn alleged that she suffered from brain injury, nerve damage, hearing loss, memory loss, spinal damage, high cholesterol, depression, and anxiety.  R. 92.

On July 8, 2011, psychiatrist Dr. Elizabeth Kuester, M.D., performed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment.  R. 92-98.  Dr. Kuester opined that Milburn suffered from organic mental disorders due to the traumatic brain injury, and affective disorders due to depression.  Dr. Kuester opined that Milburn's mental disorders cause mild restrictions on activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  R. 92-93.

Dr. Kuester opined that Milburn was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; and moderately limited in her ability to complete a normal workweek without psychologically based interruptions.  R. 96-97.  Dr. Kuester opined that Milburn was moderately limited in her ability to interact with the general public, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in work setting.  R. 97-98.  Dr. Kuester concluded:

> PER OVERALL MER AND FUNCTIONING, CLAIMANT COULD LEARN AND PERFORM SIMPLE, REPETITIVE TASKS ADEQUATELY WITH ORDINARY SUPERVISION. CLAIMANT SHOULDN'T HAVE TO DEAL WITH THE PUBLIC, BUT OTHERWISE COULD RELATE ACCEPTABLY TO THE EXTENT TYPICAL OF SIMPLE WORK. CLAIMANT COULD MAKE BASIC WORK DECISIONS, AND ADAPT TO A ROUTINE AS ABOVE.

R. 98 (all capitals in the original).  On July 25, 2011, the Social Security Administration's disability adjudicator/examiner found that Milburn was not disabled.  R. 100-01.

On June 27, 2011, state agency psychologist Dr. Stephen G. Vincent, Ph.D., conducted a consultative mental status assessment of Milburn.  R. 616-19.  Dr. Vincent had to speak loudly during the examination because Milburn suffered from hearing loss.  On examination, Milburn's speech was

adequate with normal rate and volume, but she was sometimes slow to respond to questions. Dr. Vincent had to simplify and rephrase instructions for the psychological tests he administered. At times during the examination, Milburn was "somewhat confused and was rather concrete of thought." R. 617. Dr. Vincent observed that Milburn's mood was moderately depressed. Milburn's limited thought processes compromised her speech and the accuracy of her responses. She had "poor self-correction without assistance from the examiner." R. 617.

Dr. Vincent diagnosed Milburn with cognitive changes status posttraumatic brain injury, and major depression. Dr. Vincent explained:

> SUMMARY AND CONCLUSIONS: Sharon presents with *a* history of problems with residual effects of a TBI related to a motor vehicle accident with left side involvement including fine and gross motor skills, balance and coordination, as well as neuropsychological deficits including speech and language, memory and cognition, executive function, with co-morbid depression related to her awareness of her changes in regards to ability to function as she has in the past. She is not psychotic, nor suicidal. She reports fair response to her antidepressant medication. She does tend to withdraw and isolate.

R. 619.

On December 13, 2011, the Social Security Administration reconsidered Milburn's application. Psychologist Dr. Donna Hudspeth, Psy.D., performed a second Psychiatric Review Technique and Mental

Residual Functional Capacity Assessment on December 7, 2011. R. 105-11. Dr. Hudspeth agreed with Dr. Kuester's opinions. Dr. Hudspeth repeated verbatim Dr. Kuester's conclusion quoted above. R. 111. On December 14, 2011, the Social Security Administration's disability adjudicator/examiner found on reconsideration that Milburn was not disabled. R. 113-14.

On October 3, 2012, Milburn went to the Veterans Administration (VA) Springfield, Illinois, Medical Clinic for a full physical. Milburn saw staff physician Dr. Basanti Mukerji, M.D. Dr. Mukerji noted that Milburn had decreased hearing in her right ear and no hearing in her left. Dr. Mukerji stated that her internal ear was fine, but her external was not. He stated that she had serous otitis. In addition, Milburn's cholesterol was high, but the remainder of the physical examination was normal. Milburn also received a flu vaccination. R. 746-50.

On December 12, 2012, Milburn spoke to Dr. Mukerji on a telephone clinic visit. Milburn reported that her hearing in her left ear was slowly coming back and the hearing loss in her right ear was decreasing. She reported that she could hear a little better, but still had problems. Dr. Mukerji noted that "she has retired and is enjoying life." Dr. Mukerji requested a consultation with VA audiology clinic in Peoria, Illinois. R. 744.

On December 13, 2012, Milburn saw VA psychiatrist Dr. Georgia Davis, M.D., for medical evaluation and management.  R. 741-43.  Dr. Davis saw Milburn for depression, insomnia, malaise and fatigue, and post-menopausal syndrome.  Milburn reported that she was not doing well.  She reported that she quit her job in October.  She was very anxious and fatigued.  She was still grieving the loss of her mother.  On examination, Milburn was dysthymic and anxious, but otherwise normal.[1]  Dr. Davis assigned Milburn a Global Assessment of Functioning (GAF) score of 65.  A GAF score of between 61 and 70 means some mild symptoms or some difficulty functioning, but generally functioning pretty well.  Diagnostic and Statistical Manual for Mental Disorders (4th ed. Text Revision 2000) (DSM-IV-TR), at 34.[2]

On January 4, 2013, Milburn filed another application for Disability Benefits.  She again alleged that she became disabled on March 16, 2011.  She reported that she last worked on October 5, 2012, but the work was not substantial gainful activity.  R. 117.[3]

---

[1] Dysthymic means symptoms of mild depression.  Dorland's Illustrated Medical Dictionary (32nd ed. 2012) (Dorland's), at 582.

[2] The American Psychiatric Association no longer recommends using GAF scores.  Diagnostic and Statistical Manual for Mental Disorders (5th ed. 2013) (DSM-V), at 16.

[3] Substantial gainful activity is work done for pay or profit that involves doing significant physical or mental activities.  20 C.F.R. § 404.1572; see also 20 C.F.R. § 404.1574 and 1574a.

On March 13, 2013, Milburn saw Dr. Davis.  R. 738-39.  On examination, Milburn's mood was euthymic.[4]  Her mental status examination was otherwise normal.  Dr. Davis assigned a GAF score of 75. A GAF score between 71 and 80 means no more than transient symptoms or no more than slight impairment of functioning.  DSM-IV-TR, at 34.  Dr. Davis noted:

> Much improved in terms of sleep and mood.  Her motivation has improved as have her organizational skills.  She says her husband notices the change and their relationship is improving because she is more pleasant and less irritable.

R. 739.  Dr. Davis prescribed a trial of a long-lasting stimulant.  R. 739.

On April 10, 2013, psychologist Dr. Howard Tin, Psy.D., performed a Psychiatric Review Technique.  Dr. Tin opined that Milburn had mild restrictions on activities of daily living, but no difficulties in social functioning; and no difficulties in maintaining concentration, persistence or pace.  R. 118.  Dr. Tin did not perform a Mental Residual Functional Capacity Assessment.  On April 15, 2013, the Social Security Administration's disability adjudicator/examiner found on reconsideration that Milburn was not disabled.  R. 122-23.

---

[4] Euthymia means a state of mental tranquility, neither depressed nor manic.  Dorland's, at 655.

On April 17, 2013, Milburn saw Dr. Davis.  R. 889-90.  Milburn reported that she had had blackouts and headaches ever since the 1986 automobile accident.  Milburn reported that she had a blackout or seizure two months earlier.  Milburn's mood was dysthymic and anxious.  Her mental status examination was otherwise normal.  Dr. Davis assigned a GAF score of 75.  R. 889.  Dr. Davis recommended a referral to a neurologist for further evaluation.  R. 890.

On July 29, 2013, Milburn saw VA audiologist Angelo Hoess, Au.D., for Compensation and Pension examination of her hearing.  R. 876-84. Hoess found sensorineural hearing loss in both ears.  Milburn's speech discrimination was 96% in the right ear and 0% in the left.  R. 880-81.

On July 29, 2013, Milburn also went to VA urgent care.  She saw Dr. B Yelamanchili, M.D., for a rash on her palms, lesions on her scalp, and left-sided mid back pain.  Dr. Yelamanchili noted that Milburn, "was evaluated thoroughly for blackout spells.  She had MRI (Magnetic Resonance Imaging) of the head, carotid and duplex scanning, electroencephalogram, etc., and no reason was found."  R. 870.

On August 6, 2013, Milburn saw VA optometrist Sarah Vanway, OD, for complaints that her vision blacks out on occasion in both eyes.  Milburn reported that these spells had occurred since her traumatic brain injury.

She reported that the spells last from a few seconds to several minutes. The blackouts did not correlate with migraine headaches. Vanway found no pathology contributing to her visual complaints. Vanway noted that VA neurologists already evaluated her for the blackout spells. Vanway recited that the neurology notes indicated that Milburn might need a cardiac evaluation because the blackout may be related to cardiac problems. R. 867-68.

On August 6, 2013, Milburn also saw audiologist Daniel Hansen, Au.D. Hansen found slight to moderate hearing loss in the right ear and profound hearing loss in the left. Milburn's speech discrimination in the right ear was 84%. R. 968.

On August 20, 2013, Milburn saw a VA physical therapist Amanda Brooks, P.T., for a rehabilitation consult. R. 861-63. Milburn reported intermittently feeling "off." At these times, she reported feeling dizzy and sometimes she blacked out. On examination, Brooks observed that Milburn had a normal gait with no loss of balance, but some caution when turning. Brooks found that Milburn had a Berg Balance Score of 43/56 "which correlates to using an assistive device such as a cane." Brooks explained the safe use of a cane to Milburn, adjusted the height of a cane for Milburn, and trained Milburn on the proper use of a cane. Brooks also

gave Milburn a home exercise routine to improve general strength and balance.  R. 862.

On August 28, 2013, Milburn saw Dr. Davis for medical evaluation and management.  Milburn reported she was still having problems with blackouts and dizziness.  Milburn reported that she was also having memory and attention problems.  Dr. Davis found that Milburn's mood was dysthymic and anxious, but her mental status examination was otherwise normal.  Dr. Davis assigned a GAF score of 65.  R. 859-61.

On August 29, 2013, Milburn underwent a Compensation and Pension exam for her mental status.  R. 850-59.  Psychologist Dr. Bridget Tribout, Ph.D. conducted the examination.  Dr. Tribout opined that Milburn suffered from the effects of a traumatic brain injury, but did not note diagnoses of either depression or anxiety.  Dr. Tribout assigned a GAF score of 75.  R. 854.  Dr. Tribout noted from a review of medical records that Milburn had symptoms of anxiety and mild memory loss.  R. 859.

On September 5, 2013, Milburn saw Dr. Parde Lalitha, M.D., for a Compensation and Pension Examination.  Dr.  Lalitha conducted a Review Evaluation of Residuals of Traumatic Brain Injury.  R. 836-44.  Milburn reported that since suffering the traumatic brain injury in 1987, she has suffered from headaches, cognitive deficits, vision blackouts, and hearing

loss.  Milburn reported that the hearing loss had worsened and she had increasing vestibular problems.  Milburn reported walking to one side and walking into walls.  Milburn reported she had problems with dates, paying bills, difficulty reading maps and following directions, forgetfulness and concentration problems.  Milburn reported suffering from anxiety.  R. 840-41.

On October 9, 2013, Milburn saw physical therapist Tatyana Beyzerov a physical therapy consult.  R. 1163-66.  Milburn reported dizziness, unsteadiness, and veering off to the left.  Milburn reported that her dizziness related to her anxiety level.  If she was not feeling stressed, her balance was fine and she had no dizziness.  On days when she was anxious, Milburn reported that she could barely walk due to her dizziness even with a cane.  Beyzerov observed that Milburn's gait was inconsistent.  Sometimes she walked slowly with a cane and tried to grab onto objects or the wall to steady herself; sometimes she walked without any hesitation and did not use the cane.  On examination, Beyzerov found that Milburn had a normal gait for her age with normal velocity and accuracy.  Beyzerov was unable to conduct a rotational chair test because Milburn closed her eyes or blinked excessively.  Beyzerov concluded that Milburn did not have vertigo.  R. 116-64.

Beyzerov attempted to do a balance assessment.  Beyzerov noted that prior to commencing the test, Milburn stood without any difficulty, but as soon as she stood on a testing platform, she swayed in all directions and could not perform the balance test.  Beyzerov found Milburn's balance score was low secondary to inconsistent performance.  Beyzerov noted several indicators for aphysiologic sway.  Beyzerov terminated the test because Milburn was so inconsistent that the test results would have been unreliable.  Milburn reported that her performance was poor due to stress and anxiety.  Beyzerov found no vestibular abnormality.[5]  Beyzerov offered Milburn a walker, but Milburn refused.  R. 1165.

On October 23, 2013, Milburn saw Dr. Davis. R. 1143-45.  Milburn reported that her symptoms had improved.  She was more productive.  She painted her kitchen recently.  She started thinking that she could do things again.  She started to want to do things again.  Milburn's mood was euthymic and the rest of her mental status exam was normal.  Dr. Davis assigned a GAF score of 65.  Dr. Davis assessed that Milburn was "much improved."  R. 1144-45.

---

[5] The vestibular system includes the parts of the inner ear and brain that help control balance and eye movements.  If the system is damaged by disease, aging, or injury, vestibular disorders can result and are often associated with one or more of these symptoms among others:  vertigo, dizziness, imbalance. Vestibular Abnormality Symptoms / Vestibular Disorders Association  www.health247.com

On the same day, October 23, 2013, state agency psychologist Dr. Michele Womontree, Psy.D., performed a Psychiatric Review Technique. R. 129-30.  Dr. Womontree agreed with Dr. Tin's opinions from April 2013. R. 129.  Dr. Womontree did not perform a Mental Residual Functional Capacity Assessment.

On October 29, 2013, Milburn saw Dr. Joshua Warach, M.D., for a neurological assessment and second opinion.  R. 1140-43.  Dr. Warach recited the prior testing in her record and noted that the results were unremarkable.  Dr. Warach noted that Milburn saw VA neurologist Dr. Avafi Artozudine on May 2, 2012 for a consultation.   Dr. Artozudine opined that Milburn might have a remote possibility of seizures.  R. 1141.

On examination, Dr. Warach noted decreased hearing in the left ear, and an abnormal Romberg test with imbalance with eyes closed.[6] Ambulation was normal.  Milburn could ambulate normally without her cane.  She could tandem walk, but demonstrated an astasia-abasia gait pattern during this maneuver.  She had normal strength, sensation, and dexterity.  Dr. Warach found that the examination was significant for memory difficulty, decreased hearing in the left ear, abnormal Romberg

---

[6] The Romberg test tests for loss of balance when standing with feet close together and eyes closed. See Dorland's, at 1715.

and astasia-abasia gait with tandem ambulation.  Dr. Warach found no

other problems.  Dr. Warach instructed Milburn not to drive or perform

dangerous activities such as climbing ladders.  Dr. Warach ordered an MRI

of her brain and an EEG.  R. 1143.

On November 18, 2013, Milburn underwent the MRI of her brain

ordered by Dr. Warach.  The MRI showed no acute findings.  R. 1110-13.

On December 5, 2013, Milburn saw Dr. Davis. The mental status

examination was normal.  Dr. Davis stated:

> Overall, she would say she is doing somewhat better since her
> stress level has diminished after quitting her job. Headaches
> still occur about once/week.  Panic attacks and mood have
> improved on medication.

R. 1132-34.  Dr. Davis did not assign a GAF score at this visit.

On December 12, 2013, Milburn underwent the EEG.  R. 1161-62.

The test showed normal results.  R. 1162.

On January 8, 2014, Milburn saw Dr. Davis.  R. 1130-32.  Milburn

reported that things were going well.  Milburn reported, "Has gotten a lot of

things done in their house that she had not been able to tackle before."  R.

1131.  Milburn's mood was euthymic and the rest of her mental status

examination was normal.  Dr. Davis assigned a GAF score of 75.  R. 1131.

On March 12, 2014, Milburn saw Dr. Davis.  R. 1127-29.  Milburn

reported:

> Has recently returned from two weeks in Mexico and it was
> good for her mood, but she fell twice while there. She has done
> well since last seen and would now like to tackle her smoking.

R. 1128.  Milburn's mood was euthymic and anxious, and her mental status

examination was otherwise normal.  Dr. Davis assigned a GAF score of 70.

R. 1128-29.  Dr. Davis assessed that Milburn was doing well.

On May 13, 2014, Milburn saw Dr. Warach for a follow-up

examination.  R. 1125-27.  Milburn reported that she had not had any spells

for the last four months.  On examination, Milburn's motor strength was

normal and her ambulation was normal without the cane.  She held the

cane, but did not use it while walking.  Dr. Warach saw no abnormal or

involuntary movements and no seizure activity.  R. 1126-27.  Dr. Warach

told Milburn that he had "exhausted what I can reasonably offer her."  R.

1127.

Dr. Warach's impression was:

IMPRESSION:

1. Recurrent spells, clinically resolved at this time.
2. Chronic imbalance, most likely on a psychogenic basis.
3. Intermittent numbness and tingling of both hands, rule out
bilateral carpal tunnel syndrome or other· neuropathy.
4. Subjective memory difficulty, most likely on a psychogenic
basis.
5. Intermittent give-a-way of the right leg of unclear etiology.

R. 1127.

On May 20, 2014, Milburn underwent a triplex study of her carotid arteries. The studies showed "minimal atherosclerosis of both of the Carotid arteries with less than 10% stenosis of both Bulbs and ICAs." The results showed no change from the study performed on May 2, 2012. R. 1124-25.

On June 12, 2014, Milburn saw Dr. Davis. R. 1123-24. Milburn reported that she was doing well and would "like to continue to tackle her smoking and improve sleep." R. 1123. Milburn's mood was euthymic, and her mental status examination was otherwise normal. Dr. Davis assigned a GAF score of 65. R. 1124.

<u>THE EVIDENTIARY HEARING</u>

On December 8, 2014, the Administrative Law Judge (ALJ) held an evidentiary hearing. R. 41-88. Milburn appeared in person and with her attorney. Vocational Expert Mary K. Andrews also appeared. Milburn's attorney clarified that the alleged Onset Date was October 5, 2012. R. 48-49.

Milburn testified first. She was 54 years old at the hearing. She completed high school. She lived with her husband in a one-story house. She had one adult child who did not live with them. Milburn drove herself to the hearing. Milburn testified that while in the Army, she served in

Hawaii, Japan, and Korea.  She did not serve in a combat zone.  R. 50, 53, 55, 58.

Milburn testified that she worked for Federal Express for 20 to 23 years.  She lifted packages, worked on the computer, and made schedules. She testified that she lifted packages weighing up to 75 to 100 pounds. She also did "a lot of standing and walking and things."  R. 67.

Milburn said she resigned from her job at Federal Express in October 2012.  She said she stopped working because, "I was too stressed.  I couldn't deal with it anymore."  R. 58.  Milburn reported that before she resigned, she was starting to have the spells that could have been seizures.  She said her vision blacked out while she was in the manager's office.  R. 68.

At the time she resigned, she was making $30,000 to $35,000 a year, depending on overtime.  R. 58-59.

Milburn said dizziness was a side effect of her medications.  She testified that she fell two weeks before the hearing.  She said, "[T]hey don't know if it's seizures or not because there's never anybody around when I have it and it seems to happen more when I'm stressed than when I'm not." R. 62.   Milburn said the medical tests she took for seizures could not rule

out seizures.  R. 63.  Milburn testified she never went to an emergency

room after a fall. R. 63.

Milburn reported that she had hearing problems.  She said she was

deaf in her left ear.  She said she also had memory problems.

> Well, my job, I couldn't remember to do things.  I was getting in
> trouble for it all the time.  And it was stressing me out.  That's
> the other reason I had to leave.

R. 69.

Milburn said her condition was the same since she quit working.  She

still forgot things and she still had headaches daily.  R. 69-70.

Milburn indicated that she used a cane because of problems with her

balance.  R. 70.  She said she walked to the left.  She said, "I run into

things and I, I – my perception I guess is what it is."  R. 70.  Milburn said

the VA physical therapist prescribed a cane for her.  R. 68, 78.

Milburn testified she had difficulty concentrating.  She said she would

start reading a book, put it down, and not remember where she was.  R. 70.

She said she ended up rereading books and re-watching movies because

of her lack of concentration.  R. 71.

Milburn testified that she had problems with being confused.  She

said she could not think of words to express herself.  She said she "don't

understand like I used to."  R. 73.

Milburn stated that she suffered from depression.  She said,

I can get up from bed and stay in the chair all day and it's gone
by and don't even know. Sometimes I don't leave the house for
a couple days or a couple weeks. It depends on, you know, if I
can think.

R. 74.  She said that she did not shower for "a couple of days" when she

was depressed. R. 74.

Milburn stated she had trouble sleeping.  She said she sometimes

slept three hours a night.  She said she did not feel like doing anything the

next day.  R. 75.

Milburn also said she suffered from panic attacks.  She said that if

she was in a room with three for four people she felt like everything was

closing in on her, and she had trouble breathing.  R. 75.  She testified that

she experienced panic attacks when she went out shopping, "Sometimes.

Sometimes I'll go and if I get too paranoid I guess I'll, I'll leave and just

leave the cart and everything there."  R. 76.  She said that she could not

talk to people in large groups.  R. 76.

Vocational expert Andrews then testified.  The ALJ asked Andrews:

Q    Okay.  I'd like you to assume we have an individual the
same age, education and experience as the claimant. This
individual is limited to no climbing of ropes of scaffolds, needs
to avoid concentrated exposure to unprotected heights and
unprotected moving machinery and is limited to hearing out of
only one ear. How would these restrictions affect the
performance of claimant's past relevant work?

R. 80.  Andrews opined that such a person could perform Milburn's prior work as a service agent at Federal Express.  R. 80.  Andrews said the person could not work if she was absent four days a month or was less than 80 percent effective at the job.  R. 80-81, 85.

Andrews testified that the person would not be able to perform the service agent job if she needed to use a cane to stand and walk.  R. 82.  Andrews opined that such a person who needed to use the cane could perform other jobs in the national economy, including storage facility rental clerk, with 1,430 such jobs in Illinois and 43,117 nationally; usher, with 277 such jobs in Illinois and 4,807 nationally; and information clerk, with 59 such jobs in Illinois, and 1,609 nationally.  Andrews said these jobs were a representative sample of the jobs the hypothetical person could perform if she also needed a cane to stand and walk.  R. 82-83.  The hearing concluded.

## THE DECISION OF THE ALJ

The ALJ issued his decision on March 19, 2015.  R. 21-35.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to

have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true,
Step 3 requires a determination of whether the claimant is so severely
impaired that she is disabled regardless of her age, education and work
experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this
requirement at Step 3, the claimant's condition must meet or be equal to
the criteria of one of the impairments specified in 20 C.F.R. Part 404
Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If
the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the
Analysis.

Step 4 requires the claimant not to be able to return to her prior work
considering her age, education, work experience, and Residual Functional
Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If
the claimant cannot return to her prior work, then Step 5 requires a
determination of whether the claimant is disabled considering her RFC,
age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),
404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of
presenting evidence and proving the issues on the first four steps.  The
Commissioner has the burden on the last step; the Commissioner must
show that, considering the listed factors, the claimant can perform some
type of gainful employment that exists in the national economy.  20 C.F.R.

§§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th

Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir.

2005).

The ALJ determined that Milburn met her burden of proof at Steps 1

and 2.  She had not worked since October 5, 2012, and she suffered from

the severe impairment of late effects of 25 years posttraumatic brain injury.

R. 23.  The ALJ determined at Step 3 that Milburn's impairments or

combination of impairments did not meet or medically equal any Listing.  R.

24-28.

At Step 4, the ALJ determined that Milburn had the following RFC:

After careful consideration of the entire record, the undersigned
finds that the claimant has the residual functional capacity to
perform a full range of work at all exertional levels but with the
following nonexertional limitations: she cannot climb ladders,
ropes, or scaffolds; she needs to avoid concentrated exposure
to unprotected heights and unprotected moving machinery; and
she is limited to hearing out of only one ear.

R. 28.  The ALJ relied on Dr. Davis' consistent finding that Milburn had a

GAF of 65 to 75 and the medical tests that found no evidence of a seizure

disorder or other identifiable neurological condition.  The ALJ also relied on

medical professionals' observations in October 2013 and May 2014 that

Milburn could walk without the use of a cane.  The ALJ found that Milburn

was not credible because her testimony was not supported by medical

evidence and was inconsistent with her daily activities.  The ALJ noted that

Milburn said she resigned in October 2012 because she was stressed, but

"the medical records reflect no significant physical or mental event in

October of 2012 that can be associated with a major loss in mental

functioning."  R. 30.  The ALJ found that the non-exertional limitations in the

RFC accommodate the impairments supported by the evidence in the

record. The ALJ found that the traumatic brain injury did not cause any

exertional impairments.  R. 31.[7]

The ALJ found at Step 4 that Milburn was able to perform her prior

work at Federal Express.  The ALJ relied on the RFC determination and the

opinions of vocational expert Andrews.  R. 31.

The ALJ found, alternatively, at Step 5 that even if Milburn could not

perform her prior work, she could perform a significant number of jobs in

the national economy.  The ALJ relied on the Medical-Vocational

Guidelines.  20 C.F.R. Part 404, Subpart P Appendix 2 and the opinions of

Andrews that a person with Milburn's age, education, work experience, and

RFC could perform the jobs of call out operator, storage facility rental clerk,

---

[7] The ALJ also discounted the determination by the VA that Milburn was disabled under VA standards.  R. 30-31.  Milburn does not challenge this portion of the ALJ's decision.

usher, and information clerk.  R. 32.  The ALJ found that Milburn was not disabled.

Milburn appealed the decision of the ALJ.  On July 28, 2016, the Appeals Council denied Milburn's request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1. Milburn then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security

Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the decision of the ALJ was supported by substantial evidence.  The consistent findings of her treating psychiatrist, Dr. Davis, that she had GAF scores between 65 and 75 supported the findings. These scores indicate that Milburn was either generally functioning pretty well or had only slight impairment of functioning due to her mental impairments.  The extensive objective medical testing supported the RFC finding.  The MRIs, EEGs, and other tests were generally normal and showed no seizure disease and no other condition.  The observations by Dr. Warach and physical therapist Beyzerov that Milburn could walk without a cane supported the RFC findings.  The determination by Beyzerov that she did not have vestibular problems supported the RFC findings. Vocational expert Andrews' opinion supported the finding that Milburn could return to her prior work at Step 4.  The decision was supported by substantial evidence.

Milburn argues that the ALJ erred because he did not consider the opinions of Drs. Kuester, Vincent, and Hudspeth secured in connection with Milburn's first application for Disability Benefits.  The ALJ did not err in deciding not to discuss these opinions.  Generally, the Social Security Administration develops a record that includes the evidence for the 12-month period before the date that a person files an application for Disability Benefits unless there is reason to believe evidence from an earlier period is necessary.  20 C.F.R. § 404.1512.  Milburn filed the relevant application on January 4, 2013.  R. 21.  Drs. Kuester, Vincent, and Hudspeth all saw Milburn more than 12 months before the application date.  Drs. Kuester and Vincent issued their opinions more than a year before the alleged Onset Date of October 5, 2012.  Dr. Hudspeth issued her opinion more than 10 months before the Onset Date.  Moreover, the records contained extensive and more recent evidence concerning her mental well-being from her October 23, 2013 evaluation by treating psychiatrist Dr. Davis, as well as the opinions of Dr. Tin and the October 23, 2013 evaluation by Dr. Womontree.  In light of remoteness of the opinions of Drs. Kuester, Vincent, and Hudspeth and the abundance of more recent evidence, the ALJ did not err in omitting these opinions.

Even if ALJ's decision to not discuss these opinions was error, it was harmless.  An error is harmless if the error would not affect the outcome. See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2013).  The extensive evidence from Milburn's treating psychiatrist Dr. Davis was far more probative of Milburn's mental state.  Any error from omitting the older opinions from non-treating sources would not have affected the outcome. Milburn's arguments to the contrary are not persuasive.

Milburn also argues that the ALJ erred in making his credibility determination.  The Social Security Administration decided to stop using the term credibility in evaluating evidence about symptoms.  SSR 16-3p, 2016 WL 1119029 at *1 (March16, 2016).  Courts "generally defer to an agency's interpretations of the legal regime it is charged with administrating." Liskowitz v. Astrue, 559 F.3d 736, 744 (7th Cir. 2009). The interpretive rules set forth in SSR 16-3p apply retroactively to this Court's review of the ALJ's decision in this case.  See Srp v. Colvin, 2016 WL 4487831, at *5 (C.D. Ill. August 25, 2016).

The ALJ's analysis met the requirements set forth in SSR 16-3p.  The Social Security Administration stated in SSR 16-3p that an adjudicator, such as the ALJ, must evaluate statements regarding the intensity, persistence, and limiting effects of her symptoms in light of all of the

evidence in the record, including the medical evidence.  The Social

Security Administration stated, "We must consider whether an individual's

statements about the intensity, persistence, and limiting effects of his or her

symptoms are consistent with the medical signs and laboratory findings in

the record."   The Social Security Administration explained that when

objective medical test results are not consistent with the individual's

statement about his symptoms, the objective medical evidence "may be

less supportive of an individual's statements about pain or other symptoms

than test results and statements that are consistent with the other evidence

in the record."  SSR 16-3p, 2016 WL 1119029 at *5.

The ALJ found that Milburn's claims of the disabling effects of her

traumatic brain injury were inconsistent with the medical evidence that

showed a less severe condition.  The ALJ similarly found that Milburn's

testimony about her functional limitations due to her brain injury were

inconsistent with medical evidence.  In light of this evidence, the Court

cannot say that the ALJ's evaluation of Milburn's statements regarding the

intensity, persistence, and limiting effects of her symptoms were patently

wrong.  See Pepper, 712 F.3d at 367.

Milburn argues that the ALJ erred in evaluating her testimony

because he did not discuss Milburn's work history.  Milburn points out that

work history may be relevant to evaluating a claimant's testimony regarding the effect of her symptoms.  See Memorandum of Law in Support of Motion for Summary Judgment (d/e 14), at 8-12 and cases cited therein.  The ALJ, however, was not required to include a written evaluation of every piece of evidence.  See  Diaz v. Chater, 55 F.3d 300, 309 (7th Cir. 1995); see also Pepper, 712 F.3d at 362.  Rather, the ALJ was required to adequately discuss the evidence relevant to the issue.  The issue under SSR 16-3p is evaluation of Milburn's statements about the effect of her symptoms on her ability to function.  The ALJ adequately discussed the relevant evidence.  The ALJ mentioned Milburn's work history, citing her military service and over 22 years of employment with FedEx, along with other relevant evidence.  See R. 29-31.  The Seventh Circuit has noted that an ALJ does not commit reversible error by failing to explicitly discuss a claimant's work history when evaluating credibility.  In Summers v. Berryhill, 864 F.3d 523, 528-529 (7th Cir. 2017), the court noted that an ALJ is not statutorily required to consider a claimant's work history as it is just one factor among many to be considered regarding credibility and is not dispositive.  Here, the ALJ did discuss the work history of Milburn as noted above.  The Seventh Circuit has ruled that complete failure to discuss work history is not enough to negate an adverse credibility finding supported by

substantial evidence.  <u>Loveless v. Colvin</u>, 810 F.3d 502-508 (7th Cir. 2016).
In this case the ALJ reached his adverse credibility finding because the
statements of Milburn were not supported by medical evidence and her
daily activities.  The ALJ did not err in failing to discuss Milburn's work
history more extensively.

THEREFORE THIS COURT RECOMMENDS that the Defendant
Commissioner's Motion for Summary Affirmance (d/e 17) be ALLOWED,
Plaintiff Milburn's Motion for Summary Judgment (d/e 13) be DENIED, and
the decision of the Commissioner be AFFIRMED.

The parties are advised that any objection to this Report and
Recommendation must be filed in writing with the Clerk of the Court within
fourteen days after service of a copy of this Report and Recommendation.
28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely
objection will constitute a waiver of objections on appeal.  <u>See</u> <u>Video
Views, Inc. v. Studio 21, Ltd.</u>, 797 F.2d 538, 539 (7th Cir. 1986).  <u>See</u> <u>Local
Rule</u> 72.2.

ENTER:  February 9, 2018

<u>s/ Tom Schanzle-Haskins</u>
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE